**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| PHILLIPS FEED SERVICE, INC. | : | |
| d/b/a | : | |
| PHILLIPS FEED AND PET SUPPLY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:22-cv-01393-JMG |
| | : | |
| FRESHPET, INC., *et al.*, | : | |
| Defendants. | : | |

_____

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                  **March 14, 2025**


**I.      OVERVIEW**

Plaintiff, pet food distributor, alleges that Defendants, pet food manufacturers, breached their distribution agreement in 2022. Specifically, Plaintiff claims Defendants terminated the agreement without giving the requisite ninety days' notice and refused to pay the Termination Payment set forth in the contract. Defendants insist that the parties mutually agreed to abandon the agreement in mid-2021, so they were no longer subject to the termination notice or payment requirements at the time of the alleged breach. Moreover, Defendants have raised a counterclaim for breach of contract, which asserts Plaintiff withheld payments for pet food products it received and resold. Plaintiff has filed a Motion for Partial Summary Judgment on its breach of contract claim as well as its claim that it is entitled to offset the amount it owes Defendants for unpaid invoices by the amount it is owed for Defendants' breach of the distribution agreement. Plaintiff's Motion for Partial Summary Judgment is granted as to the breach of contract claim and denied as to the set-off claim.

## II.    BACKGROUND

The current suit arises out of a contractual dispute between Plaintiff Phillips Feed Service Inc. and Defendants Freshpet Inc. Pursuant to the agreement signed in 2018 ("Letter of Intent"), Plaintiff "acted as the exclusive distributor of certain Freshpet products to retailers in the pet specialty channel." Joint Stip. of Material Facts ("JSMF"), ECF No. 59-4, at ¶ 14. As an exclusive distributor, Plaintiff was responsible for purchasing products from Defendants and both selling and delivering them to pet specialty retailers. *Id*. at ¶ 15.

The Letter of Intent contained a term provision which provided, in relevant part, "The initial term of this Agreement . . . shall continue until December 31, 2021 ('Initial Term'). This Agreement shall automatically renew for additional one (1) year periods ('Extended Term(s)') unless written notice is given by either Party to the other of its intention not to renew this Agreement on or before ninety (90) days prior to the expiration of the Initial Term or any Extended Term(s) . . ." *Id*. at ¶ 16; Letter of Intent ("ECF No. 57-5"), at ¶ 2. The Letter of Intent also contained a termination provision which required a party seeking to terminate the agreement prior to the end of the term to "give a minimum of ninety (90) days' notice" and make "a termination payment equal to ten (10%) percent of the Distributor's previous calendar year purchases of Vital, Nature's Fresh and Dog Nation pet food and Treats" to the non-terminating party. ECF No. 57-5, at ¶ 2.

Beginning in early 2021, the parties engaged in negotiations over terms Plaintiff proposed relating to their business relationship that were not a part of the 2018 Letter of Intent. JSMF, at ¶¶ 19-20. "[Plaintiff] requested that the parties 'renegotiate [their] contract to provide mutual benefit and protect both companies' best interests.'" Defs.' Mem. of Law in Opp. to Mot.

for Summ. J. ("ECF No. 75"), at 6.  Around June of 2021 the parties agreed to the following new

terms:

- **Payment**: Plaintiff would pay all invoices from Defendants within forty-six days of the invoice date but would receive a two percent discount if they paid within forty-five days of the invoice date. JSMF, at ¶ 23.
  - The Letter of Intent terms provided that "[Plaintiff] would pay all invoices within thirty days of the invoice date, with a 2% discount if paid within fifteen days of invoice date." *Id*. at ¶ 22.
- **Delivery Minimum Order Size**: Plaintiff would have a $500 minimum order size for Petco and PetSmart. *Id*. at ¶ 25.
  - The Letter of Intent established a $300 delivery minimum order size for all retailers. *Id*. at ¶ 24.
- **Delivery Fee & Subsidy**: Defendants would "pay a $13.50 delivery fee to [Plaintiff] for each Petco and PetSmart delivery until [Defendants'] inbound fill rate to [Plaintiff] exceeded eighty-five (85%) percent for a four-week consecutive period." *Id*. at ¶ 26. Defendants would "pay [Plaintiff] a $70.00 delivery subsidy for certain orders to certain Petco stores identified by [Defendants]." *Id*. at ¶ 28.
  - The Letter of Intent did not require Defendants to pay any delivery fees or subsidies to Plaintiff. *Id*. at ¶¶ 27, 29.
- **Refrigerated Trailer Fee:** Defendants would "make certain payments to [Plaintiff] in connection with expenses incurred by [Plaintiff] for refrigerated trailers." *Id*. at ¶ 30.
  - The Letter of Intent did not require any payments to be made by Defendants for refrigerated trailers. *Id*. at ¶ 31.

Between October of 2021 and February of 2022, the parties engaged in additional

negotiations "regarding the terms of a potential new contract." *Id*. at ¶¶ 35-36. Defendants allege

that during this period, Plaintiff "acknowledged that a new contract between [the parties] was

necessary for [Plaintiff] to continue to serve as a distributor of [Defendants'] products" and

admitted that the parties did not currently have a contract in place. ECF No. 75, at 6. However,

they never reached an agreement on a new contract, and neither party sent written notice of

termination of the Letter of Intent before it was set to automatically renew on December 31,

2021. JSMF, at ¶¶ 32-33, 38.  By February of 2022, Defendants had signed both a "Letter of

Intent" (January 18, 2022) and a "Distribution Agreement" (February 28, 2022) with another

distributor, Animal Supply Company ("ASC"), for the distribution of Defendants' products in the pet specialty retail channel. *Id*. at ¶¶ 40-42.

The Senior Vice President of Defendants, Thomas Farina, called the Chief Executive Officer of Plaintiff, Blaine Phillips, on or around February 10, 2022 "to advise [Plaintiff] that the transition date on which [Plaintiff] would cease providing distribution services for [Defendants] products would be April 4, 2022." *Id*. at ¶ 45. Six days later, Farina sent a letter confirming the transition date discussed during the phone call. *Id*. at ¶ 45. This letter was sent forty-seven days prior to April 4, 2022, when the parties' business relationship ended.  *Id*. at ¶¶ 47, 49. To date, Defendants have not paid a "termination fee" to Plaintiff equal to ten percent of the value of Plaintiff's purchases of certain brands of pet food and treats in the calendar year of 2021, which the parties agree amounted to $4,986,817.10. JSMF. at ¶¶ 51-52; Stipulation, ECF No. 79-2, at ¶ 1. In addition, Plaintiff has withheld payment to Defendant for product delivered in the net amount of $8,161, 219.66. JSMF, at ¶ 52; ECF No. 79-2, at ¶ 2.

Plaintiff filed suit in the Eastern District of Pennsylvania on April 8, 2022, alleging Defendants breached their contract and Plaintiff was entitled to the equitable remedy of set-off. Compl., ECF No. 1. Plaintiff moved for partial summary judgment on its breach of contract claim and asked the Court to find it is "entitled to effectuate a set-off against the balance owed to [Defendants] in an amount no less than $4,986,817.10 plus such other and further amounts as shall be determined by the Court after a hearing on damages." Mot. for Partial Summ. J. ("ECF No. 59"), at 2. The case was then reassigned to this Court on November 1, 2024, and oral argument was subsequently held at Plaintiff's request on the Motion for Partial Summary Judgment. ECF Nos. 86, 88.

### III.    LEGAL STANDARD

"Rule 56(c) provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Essentially, the Court must analyze "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[1] *Id*. at 251-52. A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). At this stage of litigation, all facts presented are viewed in the light most favorable to the nonmoving party, and the moving party "has the initial burden of demonstrating that *no* genuine issue of material fact exists." *Daniels v. City of Pittsburgh*, 2023 WL 2707178, at *2 (3d Cir. Mar. 30, 2023); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993) (emphasis added).

To survive a properly supported motion for summary judgment, the nonmoving party, Defendants in this case, must present affirmative evidence of specific facts in the record to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S at 256-57; *Berkeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005)) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."). It is not the role of the Court to weigh this evidence provided by the parties and

---

[1]    "The standard for summary judgment will be the same for cases where the judge sits as finder of fact." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993).

make a determination as to which facts are true; rather, the Court is instructed "to determine if there is a genuine issue for trial." *Josey,* 996 F.2d at 637.

## IV.    ANALYSIS

### a.  Mutual Rescission of the Contract

"Under Pennsylvania law, a breach of contract claim requires '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Somers v. Gen. Elec. Co.*, 2022 WL 17337560, at *2 n.8 (3d Cir. Nov. 30, 2022) (quoting *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)).

The Court's first task is to determine whether the parties were in contract at the time of the alleged breach in February 2022 and if so, what the terms of that contract were. Plaintiff argues that the original Letter of Intent was still in effect as of February 2022 because the term provision of the contract provided that it would "automatically renew for one-year terms as of December 31, 2021" unless one of the parties gave written notice of termination prior to the end of the term, which did not happen. Oral Arg. Tr. ("ECF No. 89"), at 12:7-12. Further, Plaintiff asserts that "[a]lthough the parties did modify the Agreement in certain respects, there is absolutely no evidence that either party ever requested, much less agreed to, any modification to the term and termination provision" and "there is no such writing, or indeed 'clear, precise and convincing evidence'" that the parties agreed to abrogate the agreement altogether. ECF No. 59-2, at 10, 14.

Defendants argue "as of June 2021, the 2018 Letter of Intent was terminated by agreement of the parties [via email messages] and was replaced with new and significantly different business terms." ECF No. 75, at 12.  In other words, the parties mutually agreed to abandon the Letter of Intent and form a new contract in the summer of 2021 when Defendants

agreed to Plaintiff's proposed new terms. ECF No. 89, at 37:7-11. And because these new terms did not include a term and termination provision, there was no longer a condition of automatic renewal on December 31, 2021, a requirement of ninety days' notice of termination, or a payment due for termination prior to the end of the term.

The following facts support Defendants' argument that the contract was mutually rescinded or abandoned:

- Defendants' President and Co-Founder, Scott Morris' Declaration alleges that "[d]uring late 2021 and early 2022, I frequently discussed with Blaine Phillips in our telephone conversations that the parties did not have a contract. On occasion, Mr. Phillips raised the issue, and in other calls I raised the issue. Mr. Phillips always agreed with me with respect to that issue, and never told me that he or Phillips believed that the 2018 Letter of Intent had remained in effect after the June 2021 restructuring or that it would renew for an additional one-year term in 2022." Morris Decl., ECF No. 76, at ¶ 23. Additionally, Morris alleges Phillips stated to him that, "as a result of the new arrangements agreed to in mid-2021, the parties were 'operating without a contract.'" *Id.* at ¶ 21.
- In an email exchange between Morris and Phillips on February 4, 2022, in response to Morris' assertion that "we need to get this figured out before earnings and we are currently in limbo as we don't even have a contract, as you have brought up," Phillips replied "[i]n total agreement with you. I am working on all the points now and you will have it before the end of the day." ECF No. 76-6, at 2.
- Mr. Farina's Declaration which maintains "[b]etween June 2021 and February 2022, no one at [Plaintiff's company] took the position with me that the 2018 Letter of Intent remained in effect or had renewed for an additional year," and "even if the 2018 Letter of Intent had remained in effect during 2021, it would expire no later than December 31, 2021." Farina Decl., ECF No. 77, at ¶¶ 12, 16.
- Farina's Declaration also reports "during the second half of 2021, . . . [Plaintiff's Chief Sales Officer] consistently told me that [Plaintiff] would not do business with [Defendants] under those terms" and "proposed terms for a new written agreement" which prompted another round of negotiations in the fall of 2021. *Id.* at ¶¶ 12, 13.
- Plaintiff has failed to put forth evidence of communications between the parties during their period of negotiations and after December 31, 2021, which mentions the Letter of Intent or otherwise suggests that it was still in place. ECF No. 89, at 34:21-23, 49:17-25.

The following facts support Plaintiff's argument that the contract was not abandoned entirely, only modified to include new terms for payment, delivery minimum order size, delivery fee and subsidy, and refrigerated trailer fee:

- An email from Farina to Morris sent on December 11, 2021, stating "great thing is the [contract with Plaintiff] expires 12/31 so when we light them up they have no recourse on the 10% early termination clause." Farina Exhibit 7, ECF No. 77-7.
- Deposition testimony from Morris which confirmed his understanding that the exclusivity term of the 2018 Letter of Intent "hadn't been changed by agreement through the end of 2021." Morris Dep. Tr., ECF No. 58, at 145.
- The new terms proposed by Plaintiff and agreed to by Defendants in June 2021 did not include a term and termination provision. ECF No. 59-2, at 10.
- The only written statement Defendants can point to which renounces the existence of a contract is an "email sent by Mr. Morris both well after the [Letter of Intent] had automatically renewed and after [Defendants] had already retained ASC as a replacement distributor." *Id*. at 12.
- The parties continued to perform under many of the initial terms of the Letter of Intent until April 4, 2022, "most importantly [Plaintiff] continue[d] to pick up product from [Defendant] and deliver it to their customers in the specialty pet food market, primarily PetSmart and Petco for months and months [after June 2021]." *Id* at 7, 8; ECF No. 89, at 15:11-14.
- Defendants agree that after June 2021, "[t]he parties thereafter continued to do business as they had done in the past, but subject to the new terms that replaced those in the 2018 Letter of Intent." ECF No. 75, at 12.

"Rescission is a mutual agreement by the parties to an existing contract to discharge and terminate the rights and duties thereunder." *In re McNeal*, 2024 WL 2890344, at *5 (Bankr. M.D. Pa. June 7, 2024) (citing 29 Williston on Contracts § 73:15 (4th ed.)). In the state of Pennsylvania, "[t]he parties to a contract may at any time rescind it, either in whole or in part, by mutual consent, and the surrender of their mutual rights is sufficient consideration." *PennEnergy Res., LLC v. MDS Energy Dev., LLC*, 325 A.3d 756, 773 (Pa. Super. Ct. 2024), (quoting *Flegal v. Hoover*, 27 A. 162, 162 (Pa. 1893)); *In re Bridgeport Fire Litigation,* 8 A.3d 1270, 1282 (Pa. Super., 2010). "The agreement to rescind a written contract need not be expressed in words, but

may be inferred from the acts and declarations of the parties inconsistent with the existence of the original contract." *Weldon & Kelly Co. v. Pavia Co.*, 46 A.2d 466, 468 (Pa. 1946). *See Jacobs v. Sch. Dist. of Wilkes-Barre Twp.*, 50 A.2d 354, 356 (Pa. 1947) ("It is always competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed, or a new one substituted. And this may be shown by parol, by showing either an express agreement or actions necessarily involving the alterations.") (quoting *Achenbach v. Stoddard*, 98 A. 604, 605 (Pa. Super. Ct.)); *see also Caring People Alliance v. Educational Data Systems, Inc.*, 2008 WL 4441994, at *8 (E.D. Pa. Sept. 29, 2008) ("course of performance between contracting parties can modify a contract between them despite a provision prohibiting non-written modification"). "When rescission or abandonment of a contract is to be implied from the conduct of the parties, the actions must be positive and unequivocal." *Anstalt v. F.I.A. Ins. Co.*, 749 F.2d 175, 178 (3d Cir. 1984).

"Whether or not the parties have [mutually] agreed [to rescind a contract] is a question of intention, and the existence of such intention is ordinarily an issue for the jury." *Kirk v. Brentwood Manor Homes, Inc.*, 159 A.2d 48, 51 (Pa. Super 1960). However, where there is no genuine issue of material fact as to the parties' intent, the Court may decide as a matter of law whether the contract provisions have been rescinded. *See Aquatrol Corp. v. Altoona City Auth.*, 2006 WL 2540797, at *5 (W.D. Pa. Aug. 31, 2006) ("Where there is no ambiguity in the agreement to rescind the underlying contract, a court may determine as a matter of law that the provisions of that contract have been rescinded."). In *Jacobs v. School District of Wilkes-Barre Township*, the Pennsylvania Supreme Court found that the unequivocal conduct of the parties demonstrated a mutual intent to abandon a professional employee's contract where the employee failed to report to work for two years, failed to respond to her employer's attempts to contact her,

and did not take advantage of any of the maternity leave benefits afforded to her, and the school district, as a result, employed a permanent teacher to replace her. 50 A.2d 354, 356 (Pa. 1947); *Findley v. Montour Sch. Dist.*, 2011 WL 10819542, at *6 (Pa. Commw. Ct. Dec. 29, 2011).

Defendants' evidence is insufficient to prove that the parties agreed to mutually rescind the Letter of Intent prior to Defendants' alleged breach in February 2022. In the absence of positive and unequivocal conduct from the parties demonstrating an intent to rescind the distribution agreement, the Court can decide this issue as a matter of law because there is no genuine dispute of *material* fact. The conclusion that the parties mutually agreed to abandon their entire arrangement *before* it automatically renewed on December 31, 2021, for an additional one-year term lacks evidentiary support in the record. The parties at most engaged in negotiations and reached an agreement in June of 2021 to restructure some of the terms of their business relationship, including payment and deliveries. Even construing Defendants' strongest piece of evidence, the February 4, 2022, email exchange, as supporting the idea that the parties agreed to abandon the Letter of Intent in June 2021, this email is outweighed by the parties' conduct in late 2021 until 2022. Their actions during this time are consistent with the continuing existence of their business relationship and show that they did not intend to terminate their rights and duties under the Letter of Intent. In fact, both parties admit that they continued to "do business as they had done in the past" until April of 2022. Plaintiff continued to act as an exclusive distributor for Defendants' products under the original Letter of Intent, and Defendants paid for Plaintiff's distribution services and provided it with products to distribute to retailers in the pet specialty channel. Even if Defendants mistakenly believed that the contract would expire instead of automatically renew on December 31, 2021, the December 11, 2021, email from Farina to Morris confirms an understanding on their part that the original contract was still in

effect as of that time, rebutting the argument that it was abandoned back in June. Finally, in the absence of written documentation or specific factual allegations in the record showing clear and unequivocal intent of the parties to abandon the Letter of Intent, the self-serving affidavits of Farina and Morris reporting alleged oral discussions with Plaintiff are insufficient on their own to establish a genuine dispute of fact as to the issue of contract abandonment. *See Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (quoting *Maldonado v. Ramirez,* 757 F.2d 48, 51 (3d Cir.1985) ("An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden."). Therefore, because there is no evidence that either party gave written notice of termination before December 31, or that the parties orally or through their conduct agreed to abandon their rights under the distribution agreement, the Court finds the Letter of Intent automatically renewed and was operative at the time of Defendants' alleged breach in February 2022.

Although the parties negotiated new or different terms for their business relationship via email in June 2021, these are construed as modifications to the existing contract, not a recission of the entire Letter of Intent and replacement with a new contract. In Pennsylvania, "[p]arties may, by subsequent oral [or written] agreement, modify a written contract which they have previously entered into. The new contract thus agreed upon is a substitute for the original one in so far as it alters, modifies or changes it.... [W]hen the subsequent oral [or written] contract makes only a modification of the prior written one, the terms of the written contract not modified or changed remain effective." *Amerisourcebergen Drug Corp. v. Meier*, 2005 WL 1213913, at *4 (E.D. Pa. May 19, 2005) (quoting *In re Monsour Med. Ctr. v. United States,* 11 B.R. 1014, 1017 (W.D. Pa. 1981)) (internal quotations omitted); *WMI Group, Inc. v. Fox,* 109 A.3d 740, 750 (Pa. Super. 2015) ("A contract containing a term inconsistent with a term of an earlier contract

between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. The parties may or may not at the same time agree to rescind all the other provisions of the earlier contract. Whether they do this is a question of interpretation . . .") (citing Restatement (First) of Contracts § 408 Discharge of Duty Under an Earlier Contract by a Subsequent Inconsistent Contract). "[T]he second contract is regarded as creating a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, and in addition the new terms on which they have agreed." Restatement (First) of Contracts § 223(1) (1932).

Here, the evidence shows that the parties agreed in writing to modify the terms for payment, delivery minimum order size, delivery fee and subsidy, and refrigerated trail fee. However, the remaining provisions, including the term and termination provision, remain untouched, as there is no evidence that the parties intended to or did modify or rescind these provisions. The Court is persuaded by Plaintiff's argument that the June 2021 email exchanges agreeing to new terms proposed by Plaintiff modified the contract and replaced certain terms of the Letter of Intent, but did not abandon the entire agreement. The Court finds as a matter of law that the Letter of Intent remained in effect at all relevant times prior to the transition date in April of 2022.

### b. Defendants' Breach of Contract

Finding element one of Plaintiff's claim is satisfied, the Court must next consider whether Plaintiff has shown Defendants breached a duty owed to it under the contract. Plaintiff argues that Defendants breached the Letter of Intent by failing to give the required ninety days'

notice of termination and failing to pay the termination fee in the amount of $4,986,817.10.[2] ECF No. 59-2, at 4. Defendants' argument in response rests on the premise that it could not have breached a contract that was no longer in existence.[3] ECF No. 75, at 16.

"Pennsylvania contract law begins with the 'firmly settled' principle that 'the intent of the parties to a written contract is contained in the writing itself.'" *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quoting *Krizovensky v. Krizovensky,* 624 A.2d 638, 642 (Pa. Super Ct. 1993)). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract" such as extrinsic aids or evidence. *Id*. (quoting *Krizovensky*, 624 A.2d at 642).

In this case, the contractual term in question is the term and termination provision which, in relevant part, states:

---

[2]     Additionally, although Plaintiff does not devote significant time to this argument, it briefly alleges in its preliminary statement and conclusion that Defendant breached the mutual exclusivity provision. ECF No. 59-2, at 2. Defendants contend that the period of required exclusivity expired on July 1, 2021, and therefore, their conduct in entering into a distribution agreement with ASC in 2022 was not in breach of the Letter of Intent. ECF No. 75, at 19-20. The plain language of the Letter of Intent, which became effective on July 1, 2018, provides that the parties "agree to mutual exclusivity for a period of three years in the Pet Specialty channel." ECF No. 57-5, at ¶ 3. In the absence of any evidence from Plaintiff of the parties modifying or agreeing to rescind this three-year term of exclusivity, the Court finds Defendants have not breached this provision. Counsel for the Plaintiff did not appear to object to this ruling when questioned about it at oral argument. *See* ECF No. 89, at 20:21-24 ("Now, the court asked earlier . . . was the exclusivity expired by its terms. I think that the answer is I mean it says what it says pretty clearly in paragraph three on that point.").

[3]     In fact, at oral argument when counsel for the Defendants was asked whether they contested or conceded the element of breach in the event the Court found the Letter of Intent was still in existence as of February 2022, he responded, "I'll say, Your Honor, is we didn't argue in in response to the summary judgment motion that there wasn't a breach. If that agreement was still in effect it says what it says." ECF No. 89, at 24:22-24.

> The initial term of this Agreement . . . shall continue until December 31, 2022 ('Initial Term'). This Agreement shall automatically renew for additional one (1) year periods . . . unless written notice is given . . . on or before ninety (90) days prior to the expiration of the Initial Term or any Extended Term(s) . . . [Additionally,] [i]n the event either Party terminates this Agreement prior to the end of the Term they will still be required to give a minimum of ninety (90) days' notice and the non-terminating Party shall be entitled to a termination payment equal to ten (10%) percent of the Distributor's previous calendar year purchases of Vital, Nature's Fresh and Dog Nation pet food and Treats.

ECF No. 57-5, at ¶ 2. Neither party has challenged the ambiguity of this contractual term, and the Court finds it is capable of only one reasonable interpretation. Therefore, beginning on December 31, 2021, when the Letter of Intent automatically renewed with the addition of the June 2021 modifications, Defendants were obligated to provide written notice of termination ninety days before the intended transition date and to provide Plaintiff as the non-terminating Party with a termination fee in the amount of $4,986,817.10. Defendants' notice of termination was given forty-seven days in advance of the transition date, and Defendants have yet to pay the termination fee to Plaintiff. Therefore, the Court finds Defendants have breached these two duties owed under the contract.

### c. Plaintiff's Right to Set-off

Plaintiff has also moved for summary judgment on its claim of set-off. Specifically, Plaintiff has asked this Court to reduce the amount it owes Defendant for unpaid invoices totaling $8,161,219.66 "by a set off in an amount no less than $4,986,817.10, representing the Termination Payment, plus such other and further amounts . . . as may be determined by the Court after a hearing on damages." ECF No. 59-2, at 17.  Defendants allege that under the Pennsylvania Commercial Code, Plaintiff is prohibited from delaying payment for goods it has accepted based on an alleged breach of a separate distribution agreement, and therefore, is not entitled to set-off. ECF No. 75, at 18.

Set-off permits "entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *U.S. Bank, National Ass'n v. Rosenberg*, 581 B.R. 424, 428 (E.D. Pa., 2018) (quoting *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995)). Where there is a breach of an agreement governed by the Uniform Commercial Code, "Section 2–717 . . . allows set-off in cases involving the same contract." *Carlisle Corp. v. Uresco Const. Materials, Inc.*, 823 F. Supp. 271, 274 (M.D. Pa., 1993) (internal quotations omitted).[4] The determination of whether the debts involve the same contract is a question of law which this Court is permitted to decide at summary judgment. *Honey Creek Stone Co. v. Telsmith, Inc.*, 11 Pa. D. & C. 5th 33, 53 (Pa. Com. Pl. 2009). "'To bring this provision into application the breach involved must be of the same contract under which the price in question is claimed to have been earned.'" *Carlisle Corp.*, 823 F. Supp. at 274 (quoting U.C.C. § 2–717, comment 1).

In *Honey Creek Stone Co. v. Telsmith, Inc.*, the Lawrence County Court of Common Pleas held that an original purchase agreement for a used stone crusher and subsequent contract for replacement parts were interrelated and part of the same contract because they concerned the same equipment and involved the same parties. *Honey Creek Stone Co.,* 11 Pa. D. & C. 5th, at 53. However, in a factually similar case to this one involving a distribution agreement, my colleague found "[b]ecause invoices are separate contracts, [plaintiff-buyer's] alleged damages for breach of the distributorship contracts cannot be offset against the amount it owes [defendant-seller] under the invoices." *Advanced Exports, LLC v. Seabrook Wallcoverings, Inc.*, 2019 WL

---

[4]    *Getty Petroleum Mktg., Inc. v. Shipley Fuels Mktg., LLC,* 2007 WL 2844872, at *15 (E.D. Pa. Sept. 27, 2007), aff'd, 293 F. App'x 166 (3d Cir. 2008) (quoting *Triple Crown America, Inc. v. Biosynth AG*, 1999 U.S. Dist. LEXIS 7056, at *2 (E.D. Pa. May 14, 1999) ("several courts within this District have held that '[d]istributor agreements involving goods are governed by Article 2 of the Uniform Commercial Code'").

95453, at *12 (E.D. Pa. Jan. 3, 2019); *cf EMD Performance Materials Corp. v. Marque of Brands Americas LLC*, 578 F.Supp.3d 670, 681-82 (E.D. Pa. 2022) (finding that a supply agreement is distinguishable from the traditional distributor agreement and is considered part of the same contract as individual invoices where it established "a continuous and obligated flow of Product," set forth the price, type, and quantity of goods sold, and allowed the buyer to withdraw product as needed before an invoice was issued). [5] The Middle District of Pennsylvania has also reached this conclusion with respect to distributorship agreements and invoices. *See Carlisle Corp.,* 823 F. Supp. at 274 (finding that a distributorship agreement was separate from invoices where it did not provide for the specific shipment or payment of materials and created only a potential for future sales rather than a right to payment).

The Court agrees with the findings in *Advanced Exports, LLC* and *Carlisle Corp.* and concludes that the debts between Plaintiff and Defendants in this case do not involve the same contract. The Letter of Intent broadly set forth terms for shipment of pet food products, delivery to retailers, and payment. However, it was the individual invoices that created a right to payment in various amounts depending on the size of the individual order. *See id.*; *Advanced Exports, LLC*, 2019 WL 95453, at *11-12. Therefore, where the debts are not under the same contract, Plaintiff is not entitled to a right to set-off, and its claim is dismissed.

### d. Plaintiff's Entitlement to Lost Profits

Finally, Defendants in their opposition brief argue that Plaintiff is not entitled to "damages for breach of contract for termination on less than ninety days' notice and use of a different distributor in violation of the exclusivity provisions of the Agreement." ECF No. 75, at

---

[5]    Additionally, in *Sayre v. Customers Bank*, my colleague in the Eastern District of Pennsylvania found that set-off cannot serve as a separate cause of action, as Plaintiff has alleged here in Count II. 2015 WL 3458790, at *13 (E.D. Pa. May 29, 2015).

19. Plaintiff has clarified that it is not seeking summary judgment "on this point, as it involves disputed issues of fact requiring trial related to the extent of [Plaintiff's] losses." Reply in Supp. of Mot. for Summ. J. ("ECF No. 78"), at 7; *see* ECF No. 89, at 13:14-23. The Court agrees with the parties that disputed issues of material fact exist as to this issue and it should be resolved at trial.

### d.  CONCLUSION

There is no genuine dispute of material fact as to Plaintiff's prima facie case of breach of contract. Defendants breached the Letter of Intent in February of 2022 when they failed to give ninety days' notice of termination and pay the $4,986,817.10 Terminate Fee. There is also no dispute that Plaintiff withheld payment of $8,161,219.66 for Defendants' pet food products. However, Pennsylvania case law does not support a finding of the right to set-off in situations where a buyer has withheld payment for goods in response to breach of a distribution agreement. Therefore, Plaintiff's Motion for Partial Summary Judgment (ECF No. 59) is granted as to its breach of contract claim but denied as to its set-off claim. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge